**Slip Op. 04-44**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                      :

ALLEGHENY BRADFORD         :
CORPORATION, d/b/a TOP LINE   :
PROCESS EQUIPMENT COMPANY,  :
                                        :

             Plaintiff,         :
                                        :      Court No. 02-00073
     v.                          :
                                        :

THE UNITED STATES,            :
                                        :

             Defendant.     :
_____:

[Defendant enjoined from reliquidating entries to correct liquidation in violation of court injunction.]

                                                Dated:  April 29, 2004

Womble Carlyle Sandridge & Rice PLLC, (James K. Kearney) for plaintiff.

Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (David S. Silverbrand, James H. Holl, III, and Paul D. Kovac), Philip J. Curtin, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Christopher Chen, Senior Attorney, Office of the Chief Counsel, United States Bureau of Customs and Border Protection, of counsel, for defendant.

## OPINION & ORDER

**RESTANI, Chief Judge:**

### INTRODUCTION

Plaintiff Allegheny Bradford Corporation, d/b/a Top Line Process Equipment Company

("Top Line") asks the court to find Defendant United States ("Government") in contempt for

failing to obey a court-ordered injunction of the liquidation[1] of its stainless steel butt-weld tube

fittings.  Because the Government's proposed reliquidation of the entries is unsuitable for

restoring the status quo ante, the court finds it necessary to take action in connection with the

enforcement of the injunction.

## BACKGROUND

The court's injunction was entered in connection with Top Line's suit, which claims that

the Commerce Department improperly ruled that the company's tube fittings are within the scope

of an antidumping order issued in 1993.  See Final Determination of Sales at Less Than Fair

Value and Antidumping Duty Order: Stainless Steel Butt-Weld Pipe Fittings from Taiwan, 58

Fed. Reg. 33,250 (Dep't Comm. 1993) (final admin. rev.) [hereinafter "Final Antidumping

Order"].

The scope proceedings began on April 12, 2001, with Top Line's request for a scope

ruling from Commerce regarding its tube fittings imported from Taiwan.  The scope request

culminated in a final ruling by Commerce that Top Line's tube fittings are within the scope of the

Antidumping Order and thus subject to antidumping duties upon entry.  See Final Scope Ruling

---

[1] Liquidation is defined as the "final computation or ascertainment of the duties or drawback accruing on an entry."  19 C.F.R. § 159.1.  Reliquidation is "the re-calculation of the duties or drawback accruing on an entry."  Shinyei Corp. of America v. United States, 355 F.3d 1297, 1310 n.8 (Fed. Cir. 2004).

on the Antidumping Duty Order on Stainless Steel Butt-Weld Pipe Fittings from Taiwan:

Allegheny Bradford Corporation d/b/a Top Line Process Equipment, 66 Fed. Reg. 65899 (Dept.

Commerce Dec. 21, 2001) ("Final Affirmative Scope Ruling").

In response to the unfavorable scope ruling, Top Line filed suit under 28 U.S.C. § 1581(c)

and thereafter filed a Motion For Judgment Upon the Agency Record on June 17, 2002, alleging

that the Final Affirmative Scope Ruling was "unsupported by substantial evidence on the record

and otherwise not in accordance with law." Petitioner's Scope Br. at 1. This motion is pending

before the court.

Top Line moved for an injunction of liquidation in order to preserve the status quo.

Injunctive relief is made available under such circumstances by 19 U.S.C. § 1516a(c)(2), which

permits the Court to enjoin the liquidation of merchandise subject to an affirmative scope

determination during the pendency of the litigation. See 19 U.S.C. § 1516a(c)(2) (allowing for

injunctive relief in the case of determinations described under 19 U.S.C. § 1516a(a)(2), including

scope determinations under (a)(2)(B)(vi)); see also AK Steel, 281 F.Supp. 2d at 1318. In this

case, the court granted the motion on February 26, 2002, enjoining the liquidation of Top Line's

tube fittings from Taiwan during the pendency of the litigation reviewing the Final Affirmative

Scope Ruling.   In the pertinent part of the order, the court:

> ORDERED that the Defendant, together with its delegates and officers, agents, servants and employees of the United States Customs Service and/or the United States Department of Commerce be, and they hereby are, enjoined during this litigation from the liquidation from the liquidation of any and all entries of stainless steel butt-weld tube fittings from Taiwan which are covered by the Final Affirmative Scope Ruling on December 10, 2001, and notice of which was published in the Federal Register on December 21, 2001, 66 Fed. Reg. 65899, and which entries remain unliquidated at the close of business on the day following the day on which a copy of this order is personally served by Plaintiff on the following individuals and received by them or their successors or their delegates: (1) Ann Sebastian, A.P.O. Coordinator, U.S. Department of Commerce, 14th and Constitution Avenue, N.W., Room 1870, Washington, D.C.; and (2) Hon. Robert C. Bonner, Commissioner of Customs, Attention: Alfonso Robles, Chief Counsel, U.S. Customs Service, Suite 4.4B, 1300 Pennsylvania Avenue, N.W., Washington, D.C.

Order (Ct. Int'l Trade Feb. 26, 2002).[2] Top Line served the injunction on Commerce and

Customs on March 4, 2002.

Commerce's procedure for handling injunctions such as the one issued in this case is as

follows: the Import Administration's office director passes a copy of the injunction to the

program manager; the program manager passes it to the analyst handling the case; the analyst

prepares instructions for Customs regarding the implementation of the injunction; the

instructions are reviewed by the program manager; the analyst forwards the approved instructions

---

[2] On February 28, 2002—two days after the issuance of the injunction but before it was served by Top Line—Commerce instructed Customs to liquidate "all entries for all firms exporting SSBWPF [stainless steel butt-weld pipe fittings] from Taiwan to the United States during the 2000–01 period, except for SSBWPF exported by Ta Chen Stainless Steel Pipe, Ltd., Laing Feng Stainless Steel Fitting Co., and Tru-Flow Industrial Co., Ltd." Def.'s Opp'n Mot., Decl. of Edward Yang at ¶ 3. The exports of those named firms were under administrative review at the time and were not imported by Top Line, which imports its tube fittings from King Lai International Co., Ltd.

to another Commerce employee who transmits the instructions to Customs; Customs headquarters reviews the instructions and then posts them on the Customs' Electronic Bulletin Board ("CEBB").   Def.'s Opp'n Mot., Decl. of Edward Yang at ¶6.

As for Customs, it has a parallel procedure: a staffperson in the Chief Counsel's office delivers copies of the order to the staff assistant to the Executive Director of Trade Compliance and Facilitation, Office of Field Operations; the Executive Director or a subordinate passes a copy of the order to Chief of the Other Government Agencies Branch ("OGA"); the Chief of the OGA delivers the copy to the appropriate OGA Program Manager; the OGA Program Manager verifies that instructions for the implementation of the order have been received from Commerce; if no instructions have been received, the OGA Program Manager contacts Commerce, obtains the instructions, reviews them, and eventually posts them on the CEBB.  Def.'s Opp'n Mot., Decl. of Alfred S. Morawski at ¶ 3.

In this case, the standard procedure did not survive the initial steps, either at Commerce or Customs.  As noted above, Commerce was served by Top Line on March 4, 2002.  That same day, Commerce's docket center forwarded the injunction to Edward Yang, the Import Administration Office Director with responsibility for stainless steel butt-weld pipe fittings from Taiwan.   Def.'s Opp'n Mot., Decl. of Edward Yang at ¶ 5.  Mr. Yang signed for the injunction,

but thereafter the injunction languished. According to Mr. Yang, a heavy workload caused the standard procedure to break down, preventing the prompt transmission of instructions to Customs. Id. at ¶7.

Similarly, Customs received a copy of the order on March 4. The appropriate staffperson in the Chief Counsel's office delivered a copy of the order to the staff assistant to the Executive Director of Trade Compliance and Facilitation on March 6, 2002. Here the trail ends. The Chief of the OGA does not recall receiving the order from the Executive Director's staff assistant, speculating instead that the order was "misplaced" and that the standard procedures "were not followed." Def.'s Opp'n Mot., Decl. of Alfred S. Morawski at ¶ 4. At the time, Customs did not keep records that would reveal the fate of the copy of the order. Customs has since implemented tracking procedures in an attempt to remedy this deficiency. Id.

For whatever reason, the standard procedures did not result in the prompt issuance of proper instructions to Customs. Instead, on February 28, 2002, Commerce instructed Customs to liquidate entries of stainless steel butt-weld pipe fittings entered between June 1, 2000 and May 31, 2001, without excepting imports from Top Line's Taiwanese manufacturer, King Lai. Though the injunction order was served on Commerce and Customs several days later, it was not

until June 4, 2002, that Commerce issued instructions implementing the order.[3]   Though these

instructions were sent on June 4, they were not posted by Customs on its electronic bulletin board

until June 10.  In the interim, on June 7, Customs acted under its February 28 orders from

Commerce and liquidated fourteen entries of Top Line's tube fittings.

On June 18, 2002—after it was clear that liquidation had been enjoined—Customs port

officials advised Top Line of the liquidations and advised Top Line of the need to protest them in

order to avoid finality.  Id. at ¶ 8; Pl.'s Mem. in Supp. of Contempt Mot., Ex. 2, Affs. of Kevin J.

O'Donnell and Charles M. Watson.  Top Line paid all duties indicated on Customs' invoices,

which were issued as a result of the enjoined liquidations,  Pl.'s Mem. in Supp. of Contempt

Mot., Ex. 2, O'Donnell Aff. at ¶ 5, and which itemized the duties and fees assessed by Customs

on each entry.  See Pl.'s Mem. in Supp. of Contempt Mot., Ex. 2, Watson Aff., Exs.  Top Line

filed a protest on July 22, 2002.  Id.  Customs refused Top Line's request to reverse these

liquidations.

_____

[3]  The eventual issuance of instructions was set in motion when the Justice Department
sent a copy of the injunction to an attorney in Commerce's Office of the Chief Counsel.  The
Commerce attorney then alerted the program manager on May 17, 2002, as to the need to
respond to the injunction.  Finally, on June 4, Commerce transmitted to Customs notification of
the injunction on SSBWPF from Taiwan manufactured or exported by King Lai along with
instructions to: (1) refrain from liquidating entries of subject merchandise from King Lai which
were unliquidated at the close of business of March 5, 2002; and (2) unset immediately any
entries that might be set for liquidation.  Def.'s Opp'n Mot., Decl. of Edward Yang at ¶ 11.

On August 29, 2002, Top Line filed a motion for an order to show cause why the Government should not be held in contempt pursuant to Rules 7 and 63 of this Court. The motion asks the court to order Customs to reverse the liquidations and pay the costs and attorneys' fees incurred by Top Line in protesting the June 7 liquidations. The court heard oral argument on the motion on April 6, 2004.

At oral argument, the Government waived any other action on the motion for order to show cause. Accordingly, the court proceeded directly to the underlying issue of whether the Government should be held in contempt. At the conclusion of oral argument, the court gave the parties two weeks in which to agree on a procedure that would cancel the liquidations and return to Top Line the monies it paid on those liquidations. At the end of the two weeks, the Government submitted to the court a status report describing the Government's intention to reliquidate the entries and make refund with interest on or before June 19, 2004. Def.'s Status Report (Apr. 20, 2004). The Government did not explain how it can reliquidate entries before the final rates of duties are known. While Top Line is not altogether adverse to the proposed "reliquidation," Top Line rejected this arrangement as inadequate because it failed to reimburse Top Line for the costs and attorneys' fees incurred in the course of the protest and litigation. Pl.'s Resp. to Def.'s Status Report (Apr. 21, 2004). Top Line also seems to disagree with some

aspects of the proposed "reliquidation."  Id.

## DISCUSSION

**I.      JURISDICTION**

Despite engaging in settlement negotiations with Top Line after oral argument, the

Government appears to challenge the jurisdiction of the court.  Citing the statutory scheme for

protesting Customs' determinations, 19 U.S.C. § 1514, the Government maintains that the illegal

liquidations should be dealt with at the administrative level.  See Sandvik Steel Co. v. United

States, 164 F.3d 596, 599 (Fed. Cir. 1998) ("When administrative remedies have not been

exhausted, judicial review of administrative action is inappropriate") (internal quotations

omitted).

The Government originally argued that 19 U.S.C. § 1514 offered the sole remedy by

which Top Line could prevent the improper liquidations from becoming final and conclusive.

Def.'s Opp'n Br. at 8–9.  The Government now argues that, under § 1514(b), the pendency of the

litigation prevents the liquidations from becoming final, thereby making them unripe for judicial

review.  Def.'s Mot. at 3–4 (Apr. 1, 2004).  Under this view, it is unclear when, if ever, finality

attaches.  It is also unclear when an administrative remedy becomes exhausted and thus ripe for

judicial review.  In essence, the Government argues that Customs is free to delay action until the

conclusion of the scope litigation, and that, in the interim, the court is powerless to ensure that

the injunction protects Top Line.  See 19 U.S.C. § 1516a(c); Zenith Radio Corp. v. United States,

710 F.2d 806, 809–10 (Fed. Cir. 1983) (interpreting § 1516a(c) to require that an injunction be

granted only where the party shows that it will otherwise be immediately and irreparably injured).

 The Government's argument fails to grasp the defining aspect of this dispute: the liquidations

violated a valid order of the court.  In such a situation, it is manifestly inadequate to delay relief

to the party protected by the order until a time when the need for the order has passed.[4]  It is also

inappropriate to suggest that court orders may be ignored when a party finds it efficient to do so.

### A.      Section 1514 and the Exhaustion of Administrative Remedies

In creating the § 1514 protest procedure, Congress expressed a preference for

administrative protest as a precursor to judicial review.  See United States v. A.N. Deringer, Inc.,

---

[4]    The Government's argument, by insisting that the improper liquidations may not be reviewed until the conclusion of the underlying scope litigation, overemphasizes the effect that should be given to § 1514(b).  Section 1514(b), in relevant part, prevents certain determinations of Customs from becoming final when an action is commenced with this Court.  19 U.S.C. § 1514(b).  Section 1514(b) was enacted in 1979, before the Court had power to enjoin liquidation pursuant to § 1516a(c).  Cemex, S.A. v. United States, 279 F.Supp. 2d 1357, 1362 (Ct. Int'l Trade 2003).  Because the injunction power allows the Court to protect an importer from liquidations that might otherwise become final and unreviewable, "§ 1514(b) seems somewhat redundant."  Id.  The court finds it unreasonable to construe § 1514(b)—a statutory provision with an ambiguous purpose—to preclude review of the improper liquidations and thereby frustrate the intent of an injunction order granted pursuant to § 1516a(c), a provision with the clear purpose of providing temporary protection to parties who contest agency determinations.

593 F.2d 1015, 1021 (C.C.P.A. 1979).  Recognizing the import of § 1514, the courts rejected the

proposition that, where a Customs decision violated an existing *agency* order, the decision was

void and the party was able to bypass the requirements of the protest procedure. See United

States v. Cherry Hill Textiles, Inc., 112 F.3d 1550, 1557 (Fed. Cir. 1997) ("the underlying policy

of section 1514 . . . is to channel challenges to liquidations through the protest mechanism")

(citing Deringer, 593 F.2d at 1021).  In those cases, the precedent of the Federal Circuit "does not

recognize a distinction between 'void' and 'voidable' liquidations for purposes of determining

the applicability of the protest requirement of section 1514."  Cherry Hill Textiles, 112 F.3d at

1559 (citing Omni U.S.A., Inc. v. United States, 840 F.2d 912 (Fed. Cir. 1988), and Juice Farms,

Inc. v. United States, 68 F.3d 1344 (Fed Cir. 1995)).

These cases, however, do not address a situation in which Commerce and Customs have

failed to effectuate a § 1516a(c) court-ordered injunction.  Instead, they involve liquidations that

were improper because they conflicted with prior *administrative* decisions.  In Omni, liquidations

were suspended by Commerce.  840 F.2d at 912.  The same was the case with Juice Farms, 68

F.3d at 1345.  In Deringer, Customs liquidated goods that were subsequently rejected by the

Food and Drug Administration.  The predecessor to the Federal Circuit held that § 1514

"contemplates both the legality and correctness of a liquidation be determined, at least initially,

via the protest procedure." Deringer, 593 F.2d at 1020.  The Federal Circuit, in deciding Juice

Farms, took this to mean that "all liquidations, whether legal or not, are subject to the timely

protest requirement." 68 F.3d at 1346.

These interpretations of § 1514, including their rejection of the voidance doctrine, are

distinguished from the instant case by the fact that they did not involve a violation of a court

order.  Indicating that administrative procedures are  not always a necessary precursor to judicial

review, the Federal Circuit circumscribed the seemingly broad reach it had previously given to

the § 1514 protest procedure in Shinyei Corp. of America v. United States, 355 F.3d 1297 (Fed.

Cir. 2004):

> [Section 1514(a)] is fairly construed to prohibit a challenge to "decisions" of the Customs
> Service "as to" liquidation outside the protest provisions of section 1514(a).  It is not,
> however, fairly construed to prohibit reliquidation in all cases, particularly when the
> alleged error is with Commerce instructions . . . . Underlying the government's argument
> as to section 1514 is the notion that Congress has placed significant value on the finality
> of liquidation, and that finality should not be disturbed outside the provisions of section
> 1514.  We do not agree.  To begin with, no section in the statute provides that
> liquidations are final except within the narrow confines of section 1514; the statute's
> discussion of finality relates to decisions of Customs.  Indeed, the very existence of
> section 1514 suggests that Congress recognized the necessity of providing relief in
> situations in which errors occurred.

Id. at 1311.  Recognizing the limits of the applicability of § 1514, the Shinyei court refused to

construe the statute in a way that would prevent a court from addressing an agency's failure to

comply with a court order:  "short of compelling legislative history or statutory evidence, we

decline to find that the statute as a whole was intended to preclude judicial enforcement of court

orders after liquidation." Id. at 1312.

Thus, the Federal Circuit has not immunized agency actions from the force of pre-existing court orders through the wholesale rejection of the voidance doctrine. Instead, it rejected the voidance doctrine where Customs made a determination that violated an existing administrative order or regulation and where a meaningful administrative remedy was available. In those cases, there were sound reasons for requiring the exhaustion of administrative remedies. Those reasons do not apply here, where further administrative review will only delay relief and frustrate the intent of the injunction order.

The exhaustion doctrine seeks to protect administrative agency authority and promote judicial efficiency. Sandvik Steel, 164 F.3d at 600. The interest of administrative authority is concerned with allowing an administrative agency "to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors." Id. (citing Parisi v. Davidson, 405 U.S. 34, 37 (1972)). Judicial efficiency is served by allowing an agency "to correct its own errors so as to moot judicial controversies." Id.

It serves neither purpose to require Top Line to use the protest procedure or wait until the conclusion of the litigation on the merits. Neither Commerce nor Customs has a special competence which enables it to determine whether a court order should be obeyed. "[W]here Congress has not clearly required exhaustion, sound judicial discretion governs." Id. (quoting McCarthy v. Madigan, 503 U.S. 140, 145 (1992). Sound jurisprudence dictates that exhaustion is not required where a party seeks enforcement of a court order that was issued to protect that party.

**B.      Customs is an Inappropriate Administrative Forum**

Even if exhaustion were appropriate, Customs is the wrong forum for it.  In arguing that the liquidations have yet to become final, the Government relies heavily on § 1514(b), which pertains to the finality of Customs' determinations.   19 U.S.C. § 1514(b).  The Government overlooks the fact that a determination by Customs is not the source of Top Line's injury.

Section 1514(b) provides that "determinations of the Customs Service" with respect to entries subject to final antidumping or countervailing duty determinations will be final and conclusive unless an action is filed with this Court.  Id.  What is being challenged here is not such a "determination."  At the beginning of this case, Commerce made a determination that the merchandise was subject to antidumping duties.  See 19 U.S.C. § 1516a(a)(2)(B)(vi) (providing that Commerce's scope determinations are reviewable by the Court).  Commerce then ordered Customs to liquidate entries in accordance with its determination.  That determination is not at issue here.  What is being challenged  is the liquidation of merchandise in violation of a court-ordered injunction.

Even assuming Customs had made a determination in liquidating the June 7 entries, the Government has not demonstrated that the decision to liquidate was an exercise of Customs' discretion.  In implementing the instructions of Commerce to liquidate entries subject to an antidumping or countervailing duty order, Customs' actions are ministerial in nature.  Yancheng, 277 F.Supp. 2d at 1364 (quoting Springfield Indus. v. United States, 11 CIT 123, 655 F.Supp. 506, 507 (Ct. Int'l Trade 1987)).  Further, Customs has no authority, statutory or otherwise, to determine whether a court-ordered injunction of liquidation should be enforced.  That is, when a

party protests a liquidation in violation of a court order, the outcome is foreordained.  Yet despite

the obvious injury to the party protected by the order, the effect of the Government's position is

to delay relief until the conclusion of the litigation.  This, of course, would allow the economic

detriment of a liquidation and exaction of funds to persist through the course of the litigation,

thereby frustrating Congress' intent to provide injunctive relief from liquidations pursuant to 19

U.S.C. § 1516a(c).  See Zenith Radio Corp., 710 F.2d at 811 ("The greatest concern [of

Congress] warranting modification of the prior law was the inadequacy of prospective relief").

To require Top Line to utilize administrative remedies is to require Top Line to engage in

a futile undertaking that will only delay relief.  See Yancheng, 277 F.Supp. 2d at 1364.  Indeed,

the essential problem here is not with Customs.  Where Commerce is alleged to have committed

an error in providing liquidation instructions, § 1514 does not apply.  Shinyei, 355 F.3d at 1304.

Instead, an action challenging Commerce's liquidation instructions is a challenge to the

administration and enforcement of final results, and accordingly finds its jurisdictional basis in

28 U.S.C. § 1581(i)(4).  Id. at 1305 (citing Consolidated Bearings Co. v. United States, 348 F.3d

997, 1002 (Fed. Cir. 2003)).[5]

## C.      The Voidance Doctrine

The application of the voidance doctrine is supported by the inadequacy of administrative

remedies and the inappropriateness of Customs as a forum for any such remedies.  Here, as in

other cases where liquidations violated an order of this Court, there is no meaningful protest to

---

[5] In this case, however, jurisdiction is also a necessary corollary to the court's jurisdiction under 28 U.S.C. § 1581(c) to issue the injunction in the first instance.

be had the administrative level nor is a determination of Customs really at issue.  See, e.g.,

Eurodif S.A. v. United States, 2004 Ct. Int' Trade LEXIS 4 (Ct. Int'l Trade 2004); AK Steel

Corp. v. United States, 281 F.Supp. 2d 1318 (Ct. Int'l. Trade 2003); Yancheng, 277 F.Supp. 2d

1349.  Put simply, a court-ordered suspension of liquidations creates a whole different ball game

apart from the standard protest and judicial review framework provided by Congress.  See LG

Electronics U.S.A., Inc. v. United States, 21 CIT 1421, 1428 , 991 F.Supp. 668, 675 (Ct. Int'l

Trade 1997) ("The importer's ordinary obligation to watch for notices of liquidation is suspended

where the court has issued an order forbidding liquidation").  Liquidations in violation of a valid

court order have no legal effect, LG Electronics, 21 CIT at 1428, 991 F.Supp. at 675, and it is

futile to place a legal nullity within Congress' statutory scheme.  See Yancheng, 277 F.Supp. 2d

at 1364 ("The Court rejects the Government's contention that a protest under § 1514 is the

appropriate remedy for this matter").

In AK Steel, the Court rejected the application of the finality doctrine "where liquidation

occurs through an illegal act of Customs and in the absence of a protestable event."  The plaintiff

in AK Steel was not an importer and so lacked standing to protest liquidations.  Here, Top Line is

an importer and, depending on one's view of whether any protestable event occurred, might be

able to file a valid protest.  The court sees no reason, however, why—under these facts—the

existence of a protestable event in this case would shield the illegal liquidations from prompt

remedial action.  The crucial factor is the violation of a court order.  See Peer Chain Co. v.

United States, No. 01-00297, 2004 Ct. Int'l Trade LEXIS 19, *23 n.11 (Ct. Int'l Trade 2004)

(declining to apply the void ab initio doctrine because, unlike AK Steel, no court-ordered

injunction prevented Customs from liquidating plaintiff's entries).  Indeed, the authority suggests that—regardless of the plaintiff's ability to protest—liquidations in violation of a court order are qualitatively different from other liquidations, and so should be considered void ab initio.

Top Line is thus correct in arguing that the improper liquidations are void ab initio, and that it is inappropriate to subject a legal nullity to reliquidation and other administrative action before this Court may provide a remedy.  "The proper means to enforce an order of this Court against the Government is to seek relief in this Court; it is not to file a protest with Customs." Yancheng, 277 F.Supp. 2d at 1364.

## II.     MERITS

It should be uncontroversial to insist that court orders be obeyed, but, based on the Government's arguments in this and other cases, see, e.g., AK Steel, 281 F.Supp. 2d 1318; Yancheng, 277 F.Supp. 2d 1349; D&M Watch Corp. v. United States,  16 CIT 285, 795 F. Supp. 1160 (Ct. Int'l Trade 1992), it seems this proposition needs reinforcing.  While the court appreciates the Government's good faith efforts to resolve this dispute after oral argument, it is important to review briefly the potentially contemptuous nature of the Government's actions in this case.

To establish contempt, a plaintiff must show: (A) the existence of a valid court order; (B) defendant's knowledge of the order; and (C) defendant's disobedience of the order.  Ammex, Inc. v. United States, 193 F.Supp. 2d 1325 1327 (Ct. Int'l Trade 2002).  Liquidations in violation of a court order are illegal liquidations.  AK Steel, 281 F. Supp.2d at 1322 (referring to liquidations in violation of a court order as "illegal liquidations").

## A.    The Validity of the Court's Order

Section 19 U.S.C. § 1516a(c)(2) permits the Court to enjoin the liquidation of merchandise subject to an affirmative scope determination under appropriate circumstances. See 19 U.S.C. § 1516a(c)(2) (allowing for injunctive relief in the case of determinations described under 19 U.S.C. § 1516a(a)(2), including scope determinations under (a)(2)(B)(vi)); see also AK Steel, 281 F.Supp. 2d at 1318. The Government does not challenge the validity of the order, and the court reaffirms that the order is valid.

## B.    The Government's Knowledge of the Order

Top Line served the order on both Commerce and Customs on March 4, 2001.  The Government does not dispute that it had knowledge of the order, and the court finds that it did indeed have knowledge.

## C.    The Government's Disobedience of the Order

The Government admits that it failed to comply with the order.  Def.'s Opp'n Br. at 1 ("Certain entries subject to the Court's February 26, 2002 preliminary injunction were liquidated contrary to that order.  Full compliance did not occur here.").  The Government characterizes this failure as mere bureaucratic oversight.  By claiming that the illegal liquidations were "inadvertent" and not "willful," the Government suggests that its conduct did not rise to the level of disobedience necessary for a finding of contempt.  A finding of willful disobedience is not necessary when dealing with civil—as opposed to criminal—contempt.   Civil contempt is "a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." Yancheng, 277 F.Supp. 2d at 1357 (citing McComb v.

Jacksonville Paper Co., 336 U.S. 187, 191 (1949)).  Civil contempt allows a court to remedy

noncompliance regardless of the intent of the noncomplying party.  Id. at 1363 (citing McComb,

336 U.S. at 191).

        While the Government's illegal liquidations are sufficient to support a finding of

contempt, the more alarming aspect of this case is the Government's subsequent refusal to rectify

the situation.  Instead of reversing the liquidations and restoring the status quo ante, the

Government informed Top Line (incorrectly) that it would have to file a protest to avoid the

finality of the liquidations.  No further action was taken to remedy the harm to Top Line.  The

Government was content to keep the  money paid by Top Line to satisfy the duties wrongly

assessed to it, forcing Top Line to bear the burden of the Government's illegal conduct.  Thus,

the government is not asking merely to be excused from an illegal liquidation, it is also asking to

be excused from repairing the harm done to the plaintiff by the illegal liquidation.

        The Government submitted affidavits from Commerce and Customs officials who

attributed the illegal liquidations to heavy workloads and a failure to follow standard procedures

for the handling of court orders.  The Government's position in this litigation appears to ask the

court to tolerate noncompliance with its orders as the unavoidable cost of doing business with the

modern administrative bureaucracy.  If noncompliance was unavoidable in this case, the cost of

doing business should be borne by the government, not by the party whom the order was

designed to protect.  For the court to excuse the Government's conduct on the grounds that it is

busy would be to weaken the force and effect of any court order over the Government.

## III.    REMEDIES

To remedy liquidations that violate a valid court order, the Court  "possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." 28 U.S.C. § 1585; see also  AK Steel, 281 F.Supp. 2d at 1323 (ordering the Government to comply with the Court's order without making a finding of contempt).  This includes the power to grant "any other form of relief that is appropriate in a civil action." 28 U.S.C.§ 2643; see also Shinyei, 355 F.3d at 1312 (finding an order of reliquidation permitted by § 2643).[6]

### CONCLUSION

Accordingly,

1.  As any liquidation is enjoined, and cancellation and refund are the proper remedies, defendant shall not reliquidate the 14 entries at issue.  The court, however, has no interest in maintaining an injunction no longer desired by the party for whose protection it was issued. Thus Top Line, if it so desires for its own purposes, may move for amendment of the injunction to permit reliquidation, although it is unclear to the court what type of reliquidation could take place at this juncture.

2.  If the Government makes refund with interest of the monies exacted pursuant to the enjoined liquidation on the schedule set forth on its status report, any contempt which may have existed would be purged.

3.  Upon a final and conclusive decision on the underlying action, the Government shall

---

[6] Here, of course, reliquidation as a final recalculation of the duties owed on an entry is not possible, as the underlying litigation continues and the final and conclusive rates of duty have yet to be determined.

liquidate the 14 entries at issue in accordance with the rate of duties set forth in such decision.

4.  At this point in the litigation, as it is unclear how the equities will ultimately lie in his matter and what injuries Top Line will have suffered, the court sees no reason to take immediate action on Top Line's request for costs and attorneys' fees incurred as a result of its protest and litigation on this matter.[7]


SO ORDERED.


                                                    /s/ Jane A. Restani
                                                    Jane A. Restani
                                                    Chief Judge

Dated:  This 29th day of April, 2004.
            New York, New York

---

[7]  In another case where the Government liquidated entries in violation of a court order, this Court found that attorneys' fees could not be awarded to a plaintiff because the Government had not waived its sovereign immunity for such an award.  See Yancheng Baolong Biochemical Products Co., Ltd. v. United States, No. 01-00338, Slip Op. 04-42 (Ct. Int'l Trade Apr. 28, 2004).  Yancheng does not foreclose the possibility that attorneys' fees may be available in the instant case.  The holding in Yancheng was based in part on the fact that the party seeking attorneys' fees was not the prevailing party in the underlying litigation.  Id., Slip Op. at 22. Because the instant scope litigation remains pending, it has yet to be determined whether the same situation will apply in this case.  Furthermore, Yancheng does not represent settled law, and, as an opinion of the same level court, does not bind the court.  These considerations lead the court to reserve decision as to the availability of attorneys' fees.