# United States Court of Appeals for the Federal Circuit

04-1110, -1219

CARNIVAL CRUISE LINES, INC.,
HAL ANTILLEN, N.V., HAL SHIPPING LTD.,
WIND SURF LIMITED, HOLLAND AMERICA LINE, N.V.,
and HAL CRUISES LIMITED,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

Robert P. Parker, Paul, Weiss, Rifkind, Wharton & Garrison LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was John H. Longwell.

Todd M. Hughes, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross appellant. With him on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director. Of counsel on the brief was Richard McManus, Senior Attorney, Office of the Chief Counsel, United States Bureau of Customs and Border Protection, of Washington, DC.

Appealed from: United States Court of International Trade

Senior Judge R. Kenton Musgrave

# United States Court of Appeals for the Federal Circuit

04-1110, -1219

CARNIVAL CRUISE LINES, INC.,
HAL ANTILLEN, N.V., HALL SHIPPING LTD.,
WIND SURF LIMITED, HOLLAND AMERICA LINE, N.V.,
and HAL CRUISES LIMITED,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

_____

DECIDED:  April 12, 2005

_____

Before MICHEL, Chief Judge,[*] NEWMAN, and BRYSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BRYSON.  Concurring opinion filed by Chief Judge MICHEL.

BRYSON, Circuit Judge.

The four appellants in this case are Carnival Cruise Lines, Inc., and three of its wholly owned subsidiaries (collectively, "Carnival").  Carnival operates passenger cruise ships and therefore is subject to the Harbor Maintenance Tax ("HMT"), which is assessed under the Harbor Maintenance Revenue Act of 1986 ("HMRA"), Pub. L. No. 99-662, tit. XIV, 100 Stat. 4266-73.  The pertinent portions of that Act are codified at 26 U.S.C. §§ 4461-62.

---

[*]     Paul R. Michel assumed the position of Chief Judge on December 25, 2004.

In 1992, the United States Customs Service (now the Bureau of Customs and Border Protection) audited the HMT payments remitted by one of the Carnival entities for the period between April 1, 1987, and December 31, 1991. Following the audit, Customs assessed $322,311 in underpayments against Carnival. The two issues that formed the basis for the asserted underpayment were (1) Carnival's failure to make HMT payments based on passengers' boarding or disembarking during layover stops in the course of cruises, and (2) Carnival's deduction of travel agents' commissions from the price of the cruise tickets that Carnival used to calculate the amount of HMT that was due.

While it is clear that the HMT applies to passenger ships, the statute follows a somewhat circuitous route in imposing taxes on such vessels. The indirect manner in which the statute imposes the HMT on passenger vessels is largely responsible for the difficult statutory construction issues presented in this case.

The HMT imposes a "tax on any port use." 26 U.S.C. § 4461(a). "Port use" is defined as "the loading of commercial cargo on, or . . . the unloading of commercial cargo from a commercial vessel at a port." Id. § 4462(a)(1). The statute reaches passenger vessels by defining "commercial cargo" to include "any cargo transported on a commercial vessel, including passengers transported for compensation or hire." Id. § 4452(a)(3) (emphasis added). The statute imposes a tax "on any port use" in an amount equal to "0.125 percent of the value of the commercial cargo involved." Id. § 4461(b).

In the case of "the transportation of passengers for hire," the statute defines the term "value" to mean "the actual charge paid for such service or the prevailing charge

for comparable service if no actual charge is paid." 26 U.S.C. § 4462(a)(5)(B). The statute does not define the terms "loading" and "unloading" as applied to passengers, but the implementing regulation, 19 C.F.R. § 24.24(e)(4), states that "when a passenger boards or disembarks a commercial vessel at a port within the definition of this section, the operator of that vessel is liable for the payment of the port use fee." Based on that regulation, Customs has taken the position that when a passenger temporarily goes ashore and subsequently returns to the vessel at a layover stop, the passenger is considered to have "disembarked" and "boarded" the vessel for purposes of the HMT. Thus, Customs has taken the position that cruise operators are liable for the HMT with respect to passengers who leave the vessel at interim stops; moreover, in a January 1993 headquarters ruling, Customs took the position that there is a rebuttable presumption that every passenger on a cruise ship disembarks and reboards at layover stops. See HQ 112511 (Jan. 27, 1993).

With respect to valuation, Customs stated in the same headquarters ruling that the "actual charge" for transportation paid by the passenger includes "all embarkation to disembarkation costs reflected on passenger tickets, including commissions paid to travel agents, port taxes, charges for pilotage, U.S. Customs and Immigration and Naturalization services, wharfage, and 'suite amenities' provided they are contracted for and paid for prior to the commencement of the voyage (i.e., included in the cost of the ticket)." Customs excluded from its computation "the costs of land-based lodging and connecting air transportation." HQ 112511 (Jan. 27, 1993). In a subsequent headquarters ruling, Customs modified its position by excluding from the "actual charge"

calculation any portion of a travel agent's commission that may be attributable to land-based lodging or connecting air transportation. See HQ 112844 (Oct. 28, 1993).

Following the audit and Customs' decision with respect to the asserted shortfall in Carnival's HMT payments for the period under review, Carnival brought an action in the Court of International Trade challenging the assessment. Carnival argued that it was improper to assess HMT based on the passengers' presumed disembarking and reboarding at layover stops on cruises, and that it was improper for Customs to include, when calculating the "value" of the transportation, charges for services, amenities, and other expenses not directly tied to the actual transportation of the passengers.

The Court of International Trade initially entered judgment in favor of Carnival based on the Supreme Court's decision in United States v. United States Shoe Corp., 523 U.S. 360 (1998), which declared the provisions of the HMRA relating to exported goods invalid under the Export Clause of the Constitution. The Court of International Trade held that the provisions of the HMRA governing the transportation of passengers were likewise unconstitutional under the Export Clause. See Carnival Cruise Lines, Inc. v. United States, 8 F. Supp. 2d 877 (Ct. Int'l Trade 1998). We reversed, concluding that the provisions relating to the transportation of passengers were not invalid and that the relevant provisions were severable from the provisions that had been declared unconstitutional by the Supreme Court. Carnival Cruise Lines, Inc. v. United States, 200 F.3d 1361, 1369 (Fed. Cir. 2000). On remand, the Court of International Trade upheld Customs' position on the valuation issue with one modification: the court held that the HMT base does not include charges for port taxes and other Customs charges. Carnival Cruise Lines, Inc. v. United States, 246 F. Supp. 2d 1296, 1303 (Ct. Int'l Trade

2002).  With respect to whether disembarking and reboarding at a layover port constitute triggering events under the HMT, the court upheld Customs' position on that issue based on this court's earlier decision in Princess Cruises, Inc. v. United States, 201 F.3d 1352, 1359 (Fed. Cir. 2000).  However, the court accepted Carnival's argument that the imposition of HMT liability on the theory that Customs first put forth in HQ 112511 could not lawfully be applied to events predating the issuance of that ruling.  Accordingly, the court held that Carnival "should not be held liable for HMT payments on cruises which made only layover stops at HMT covered ports prior to the issuance of HQ 112511."  246 F. Supp. 2d at 1301.

Carnival has appealed to this court from the portion of the trial court's decision relating to valuation.  The government has cross-appealed from the portion of the trial court's decision holding the assessment of HMT for layover stops inapplicable to layover stops prior to January 27, 1993, the date on which HQ 112511 was issued.  In Princess Cruises, Inc. v. United States, 397 F.3d 1358 (Fed. Cir. 2005), we recently upheld a similar ruling by the Court of International Trade with respect to the retroactive application of Customs' theory as to layover stops.  We therefore address the government's cross-appeal as to the layover issue only briefly, and we affirm the trial court's judgment on that issue.  With respect to Carnival's appeal as to the valuation issue, to which we devote more attention, we agree with the trial court's analysis and therefore affirm on that issue as well.

II

Carnival argues that Customs included unauthorized expenses in the HMT valuation base.  In particular, Carnival objects to the inclusion of what it refers to as

"non-transportation charges reflected in a cruise package fare," such as "shipboard entertainment and suite amenities." Carnival asserts that the language of section 4462(a)(5) makes clear that only costs for "transportation" can be included in the HMT base. In support of its argument, Carnival points to the portion of the statute providing that "[i]n the case of the transportation of passengers for hire, the term 'value' means the actual charge paid for such service . . . ." 26 U.S.C. § 4462(a)(5)(B). Carnival argues that the term "such service" refers to "the transportation of passengers for hire" and that the HMT base therefore can include only charges that are "integral to the movement of passengers." Carnival points to the dictionary and to language from a prior decision by this court defining "transportation" as "transfer[ring] or convey[ing] from one person or place to another." Executive Jet Aviation, Inc. v. United States, 125 F.3d 1463, 1468 (Fed. Cir. 1997). Employing that definition, Carnival concludes that the interpretation of section 4462(a)(5)(B) "has nothing to do with whether actual or comparable charges should be used in determining the value of transportation," but rather that "[t]he question is, of the various charges that make up a package fare, which are charges for 'transportation' – and thus subject to the harbor maintenance tax?"

Carnival places too much emphasis on the term "transportation" and ignores the significance of the statutory term "actual charge." As a result, Carnival's interpretation is contrary to the language and the intent of the statute. Section 4462(a)(5)(B) provides that "[i]n the case of the transportation of passengers for hire," HMT liability shall be determined on the basis of the "actual charge for such service." The statute thus looks to the "actual charge" for the service provided, not the portion of the charge allocable to the transportation aspect of the service, assuming it were possible to calculate that

portion of the charge. While a cruise may be a particularly luxurious form of "transportation of passengers for hire," it is nonetheless a form of transportation of passengers for hire, and there is an "actual charge" for that transportation service, which is represented by the ticket price. Thus, by referring to the "actual charge paid for such service [of transportation]," the statute focuses on the "actual charge" for a service that is characterized as transportation, not on the transportation component of a service that consists largely of providing entertainment.

Carnival suggests that the "actual charge" for the service of transportation cannot vary with differences in the amenities offered to passengers. That proposition, however, is plainly incorrect. Some examples will illustrate why. A first-class passenger on a trans-Atlantic ocean liner would pay far more for a ticket than a passenger traveling in third class, but in both instances the "actual charge" for the transportation service would be the ticket price paid by the passenger in question. Both passengers are transported from one port to another, but the "actual charge" for the transportation is quite different for each.

For a second example, consider three common ways of getting to an airport—by shuttle bus, by taxicab, and by car service. Typically, the shuttle bus is the cheapest, the taxicab more expensive, and the car service more expensive yet. But in each case the "actual charge" for the transportation to the airport is the charge assessed for the trip, either by the shuttle bus driver, the cab driver, or the driver for the car service. It would be illogical to say that the "actual charge" for the transportation by taxicab or car service is the shuttle bus fare and that the remainder of the taxicab fare or the car service fee should be treated as an amenity—the greater comfort, speed, or services

offered in connection with the trip. The same is true of a cruise ship, in which the ticket price represents the "actual charge" for transportation, even though the transportation is luxurious and even though some passengers are transported in more luxury than others. Hence, if a cruise line includes in its ticket price various amenities as part of the charge for the cruise, it is proper to regard those amenities as part of the "actual charge" for the service that consists of "the transportation of passengers for hire."

Carnival contends that Customs' interpretation of the HMT statute results in a lack of parity because under Customs' interpretation the charges for amenities that are purchased aboard the ship would not count towards HMT liability, while charges for those same amenities, if incorporated in the ticket price, would be included. Although it is true that Customs' interpretation can result in the same amenity being included or not included in the HMT base depending on whether it was part of the original ticket price, that interpretation remains a reasonable one in light of the statutory requirement that HMT liability be based on the "actual charge" for the service of transportation. Moreover, any anomalies created by the use of the ticket price to determine the charge for the cruise are dwarfed by the difficulties that would be presented by attempting to quantify the transportation portion of a cruise ticket and the portion attributable to all the amenities ranging from food, lodging, entertainment, and incidental services.

In the case of a cruise for which the ticket price includes amenities, it would be impossible to segregate the component of the ticket price that is attributable to the conveyance of the passenger over the water from the component that is attributable to the amenities that are part of the cruise. Thus, if the ticket price for the cruise is not the "actual charge" for transportation, then there is no ready way to determine what that

04-1110,-1219                                    8

"actual charge" should be. Carnival's position seems to be that the "actual charge" for transportation is the price that would be charged for the conveyance of the passengers with some undefined but minimal amenities related to delivering the passengers to their destination alive and well. Yet if a ticket for that kind of "no-frills" cruise is not available, then that price is entirely hypothetical, and it cannot qualify as an "actual charge," as the statutory language requires.

Carnival argues that the HMT should be construed similarly to an excise tax on transportation that was imposed pursuant to the Revenue Act of 1941, Pub. L. No. 250, § 554, 55 Stat. 687, 721-22 (1941), the pertinent portions of which were repealed in 1962. That statute, however, was quite different from the HMT. It imposed a tax "upon the amount paid . . . for transportation . . . of persons by rail, motor vehicle, water, or air within or without the United States." 26 U.S.C. § 3469(a) (1946); see also 26 U.S.C. § 4261(a) (1958) (containing slightly different language). A Treasury Department regulation provided that in the case of an all-expenses-paid tour, "where a payment covers charges for nontransportation services as well as for transportation of a person, such as charges for meals, hotel accommodations, etc., the charges for the nontransportation services may be excluded in computing the tax payable with respect to such payment, provided such charges are separable and are shown in the exact amounts thereof in the records pertaining to the transportation charge." Treas. Reg. 42.4261-2(d) (1954). The regulation further provided that if the charges for nontransportation services "are not separate from the charge for transportation of the person, the tax must be computed upon the full amount of the payment." The pertinent revenue rulings and court decisions applying that statute and regulation made clear that

the limitation of the tax to the "transportation charge" was available only if the nontransportation services, such as meals, were "separable from the taxable charges for transportation or seating or sleeping accommodations and are shown in exact amounts thereof in the carrier's records."  Rev. Rul. 1951-23-13699, 1951-2 C.B. 218 (1951); see White House Sightseeing Corp. v. United States, 300 F.2d 449 (Ct. Cl. 1962); McGowan v. United States, 222 F. Supp. 329 (S.D. Fla. 1962); Puig v. Tomlinson, 143 F. Supp. 659 (S.D. Fla. 1956); Loew's, Inc. v. United States, 99 F. Supp. 100 (S.D. Cal. 1951).

The construction of the 1941 transportation tax statute was dictated in substantial measure by the Treasury Department regulation, which allowed carriers to avoid taxation on the nontransportation aspects of their charges to passengers, but only if the transportation and nontransportation portions of the charges were segregable and were separately listed in the carrier's records.  In this case, the statutory language ("actual charge paid" for the transportation service) suggests that the valuation determination for the HMT was not meant to be separated into a charge allocable to the movement of the passengers and a charge allocable to all amenities associated with that movement.  Moreover, unlike in the case of the 1941 excise tax on transportation, there is no Treasury Regulation providing a means for a carrier to avoid payment of the tax if the transportation and nontransportation charges are clearly distinct and are kept separate in its records.  Indeed, Carnival has not suggested that its records reflect separate listings of the exact amounts attributable to transportation on the one hand and amenities on the other.  Accordingly, even if the principles governing the 1941

transportation tax were applied in this case, it is likely that Carnival would still be subject to taxation on the entire amount of the passengers' ticket price.[1]

Finally, Carnival argues that because the language of the statute is clear, the court need not give Customs' interpretation of the statute any deference at all. As we have explained, we do not consider the statutory language to be clear, as the statute does not set forth exactly what should be included in the "actual charge" for the service of transportation of passengers for hire. However, we believe it is apparent that by using the term "actual charge," Congress was referring to the actual charge for the service provided, not some hypothetical portion of the cruise price that is attributable to the movement of the ship through the water, as opposed to other components of the cruise. Customs' approach to the interpretation of the statute is consistent with that congressional purpose. Hence, we believe that Customs' approach is a reasonable one, entitled to some deference under the Supreme Court's analysis in Mead v. United States, 533 U.S. 218, 234-35 (2001).

Under Mead, a Customs ruling may be entitled to deference proportional to its "power to persuade," depending on the "merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other source of weight." 533 U.S. at 221; see also Rubie's Costume Co. v. United States, 337 F.3d 1350, 1355-56 (Fed. Cir. 2003); Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1357-58 (Fed. Cir.

---

[1] Similar regulations govern the successor statute to the 1941 Act, which applies only to air transportation. See 26 U.S.C. § 4261; 26 C.F.R. §§ 49.4261-2(c), 49.4261-7(i), 49.4261-8(f)(4). The distinction drawn in air transportation tax regulations between undifferentiated charges for all components of an all-expenses-paid tour, which are fully taxed, and charges that are "separable and are shown in the exact amounts thereof in the records pertaining to the transportation charge," which are not taxed, is analogous to Customs' distinction between amenities purchased as part of the cruise ticket and those separately purchased on board the ship.

2001). Customs satisfies the <u>Mead</u> factors by explaining its basis for assessing the HMT based upon the fare paid by the passenger. Customs' approach to the problem of statutory construction in this case, although not explicitly dictated by the statutory language, is a reasonable one that avoids the intractable problems created by attempting to follow Carnival's approach. Customs treats the "actual charge" for the service of transportation for hire as being the ticket price, unless the ticket price includes portside charges that are clearly not part of the cruise, such as portside lodging, air fare, and travel agency commissions. While the Court of International Trade modified Customs' analysis by excluding port taxes and other Customs charges from the valuation determination, the government has acquiesced in that aspect of the decision, and we do not regard that departure from the approach employed by Customs to be sufficiently significant to undermine confidence in the general approach Customs has used.

Customs' approach avoids the need to try to quantify the unquantifiable—the portion of the cruise price that is attributable to the conveyance of the passengers from the home port to the ultimate destination without inclusion of the amenities that are offered as part of the ticket price for the cruise. Carnival's approach is not dictated by the language of the statute and should not be imposed in preference to the reasonable statutory construction adopted by Customs. Hence, except in the one respect addressed by the trial court, we accept Customs' interpretation of the statute. We therefore uphold the trial court's ruling as to the construction of section 4462(a)(5)(B).

III

We turn now to the government's cross-appeal. As noted above, the issue on cross-appeal in this case is the same as the main issue on appeal in <u>Princess Cruises, Inc. v. United States</u>, 397 F.3d 1358 (Fed. Cir. 2005), i.e., whether the cruise ship operator is liable for HMT payments for cruise ships that stopped at covered ports for layovers predating the issuance of Customs' headquarters ruling HQ 112511. The only factual difference between this case and <u>Princess Cruises</u> is that Princess received a letter from a Customs regional director stating that it would not be liable for layover HMT charges. There is no evidence that Carnival received such a letter. However, we did not treat the letter to Princess as dispositive in that case, and we do not believe the absence of such a letter calls for the application of a different legal rule in this case. Accordingly, we apply the legal analysis in <u>Princess Cruises</u> and conclude that to apply the layover liability rules against Carnival for conduct predating the issuance of HQ 112511 would deny fair notice to Carnival. Hence, for the reasons already stated in <u>Princess Cruises</u>, we hold that the trial court correctly held that Carnival is not liable for HMT payments on cruises that made only layover stops at HMT-covered ports prior to the issuance of HQ 112511.

Each party shall bear its own costs for this appeal.

<u>AFFIRMED</u>.

# United States Court of Appeals for the Federal Circuit

04-1110, -1219

CARNIVAL CRUISE LINES, INC.,
HAL ANTILLEN, N.V., HALL SHIPPING LTD.,
WIND SURF LTD, HOLLAND AMERICAN LINE, N.V.,
and HAL CRUISES LTD,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Cross Appellant.

MICHEL, <u>Chief Judge</u>, concurring.

I join with section II of the court's opinion only in-part because of its conclusion that the intent of Congress is clear. In my view, Congress's intent is utterly unclear on the precise question at issue in this case. In addition, because there is no relevant legislative history, the only evidence of Congress's intent is the text and structure of the statute. Neither is revealing.

The interpretation advanced by Customs emphasizes the term "actual charge" over the term "transportation," and Carnival's interpretation does the opposite. Customs' interpretation relies on a questionable distinction between pre-paid and on-board charges, even for identical services, and expands the term "transportation" to include all pre-paid charges, including for ship-board amenities such as "a movie or live entertainment, child care, or an ice cream soda." Moreover, although the term "actual charge" may indeed suggest that post-hoc allocation of a ticket price into hypothetical transportation and non-transportation portions is not allowed by the statute, it does not

demonstrate that Congress intended to preclude cruise ship lines from doing what other transportation providers have been allowed to do under similar statutes, that is, limit their liability by actually charging separate amounts for transportation and non-transportation services as reflected in the ticket the customer buys. On the other hand, Carnival's interpretation raises a number of complex questions on how to distinguish transportation from non-transportation charges especially after the fact, none of which appears to have been resolved by, or even within the contemplation of, Congress at the time it adopted the short and simple language at issue. Nevertheless, because Customs' interpretation is at least as plausible as Carnival's, I agree that Customs' interpretation, as slightly modified by the Court of International Trade, deserves deference under United States v. Mead Corp., 533 U.S. 218, 234-35 (2001). Thus, I join all of the analysis in section II except that saying the statute's language and Congressional purpose are clear. As to sections I and III, I join in full.

The crux of our dilemma is whether Congress limited the HMT base to charges just for shipboard transportation, or whether it included as well charges for amenities enjoyed while on-board, particularly those associated with pleasure cruises. In my view, we are left to guess whether actual charges for transportation of passengers for hire means simply those inherent in multi-day ocean transport, or everything included in the ticket price of a pleasure cruise that will be enjoyed once aboard. As a court of law, we should not be guessing what a statute means, or what Congress intended, assuming it had actual intention on the point in issue. Yet, we must decide the appeal and to do so must construe the statute as best we can. Mead gives important guidance, suggesting

04-1110, -1219                                    2

variable deference to Customs according to the persuasive power of its explanation. Here the amount of deference earned suffices, but just barely.

One can only hope that those who draft legislation on behalf of Congress will take more care to be clear. Customs, too, if it expects deference under <u>Mead</u> should assure that its interpretations of statutes it administers are well explained.