Slip Op. 06 - 90

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| UNITED STATES, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **Before: MUSGRAVE, JUDGE** |
| | : | |
| NATIONAL SEMICONDUCTOR | : | Court No. 03-00223 |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |

[Compensatory interest awarded to the plaintiff and "interest only" penalty of $10,000.00 adjudged against the defendant.]

Decided: June 16, 2006

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen*, Director, *Patricia M. McCarthy*, Assistant Director, Civil Division, Commercial Litigation Branch, United States Department of Justice (*Stephen C. Tosini*, *Elizabeth A. Holt*), and Office of the Chief Counsel, U.S. Customs and Border Protection (*Martha Toy Wong*), of counsel, for the plaintiff.

*Horton, Whiteley & Cooper* (*Robert Scott Whiteley* and *Michael J. Horton*), for the defendant.

## OPINION

As briefly described in a previous opinion on this matter, *United States v. National Semiconductor Corp.*, Slip Op. 05-9 (USCIT Jan. 26, 2005), familiarity with which is presumed, the defendant NSC conducted an extensive customs compliance review and discovered two groups of integrated circuit assemblies, microassemblies and parts thereof that had been imported under cover of numerous erroneous customs entries declaring incorrect classifications, inaccurately stated values

for certain U.S.-origin components, and improper declarations with respect to certain asserts that should have been included as additions to the transaction value of the importations.

The first group of erroneous entries pertained to importations between January 29, 1993 and September 30, 1998 through various ports. *See* P.'s Ex. 1. The errors were discovered as part of a broader program NSC undertook to review the company's customs compliance, with the assistance of an outside consultant hired for the purpose, in light of a change in NSC's customs director. *See id.*; Tr. at 77-85, 97. The second group of erroneous entries pertained to importations between March 3, 1995 and May 28, 2000 through the port of San Francisco, California. *See* P.'s Ex. 3. These errors were discovered by an NSC employee as a result of his own investigation into a question posed by one of NSC's customs brokers as to whether the value of all assists had been included in the value of the commercial invoices. *See id*; Tr. at 84-85.

None of the entries resulted in loss of duties to the United States but did result in underpayment of merchandise processing fees ("MPFs"). NSC voluntarily disclosed each matter to the U.S. Customs and Border Protection ("Customs" or "USCBP") by letters dated November 13, 1998 and March 3, 2000, respectively, and ultimately tendered the underpaid MPFs as calculated by Customs. *See* P.'s Exs. 1–5. Customs accepted each tender, but deemed that negligent violations of section 1592(a) were involved with each entry. Had Customs itself discovered the entry irregularities, the maximum penalty might have been the lesser of the domestic value of the merchandise or twice the loss of "fees of which the United States is or may be deprived." 19 U.S.C. § 1592(c)(3).[1] *See* 19 U.S.C. § 1592(a); 19 C.F.R. § 162.73(a)(3). As it happened, because

---

[1] It is also an open question whether under such circumstances Customs would have
(continued...)

disclosure had been voluntary, the maximum statutory penalty that Customs could pursue was the interest, from the date of liquidation, on the amount of the fees of which the United States had been deprived. *See* 19 U.S.C. § 1592(c)(4); 19 C.F.R. § 162.73(b)(2).

Customs therefore issued penalty notices to NSC on February 15, 2001 and assessed the maximum amount of interest allowed by law that had accrued on each entry since the date of liquidation to the dates of its earlier pre-penalty notices. *See* 19 U.S.C. § 1592(c)(4). NSC objected, taking the position that it should not be assessed a "maximum" penalty for acting responsibly by voluntarily reporting the problems that it had discovered on its own initiative. The government then brought suit for violations of 19 U.S.C. § 1592(a). NSC's answer averred that its conduct had been ordinary negligence and denied that it should have to pay a "maximum" penalty, if any. NSC further pointed out that the statute of limitations, once operable, would have cut off any action by Customs as to relevant entries. After the parties' cross-motions for summary judgment were denied in Slip Op. 05-9, the parties arranged for trial in San Francisco beginning January 10, 2006, and completion of post-trial briefing on March 3, 2006.

The government continues to argue that full award of the maximum amount of interest is necessary because NSC has had the theoretical equivalent of an "interest-free loan" from the government during the period in question and has therefor obtained a theoretical advantage over competitors who did not make unlawful, negligent customs entries, and it also argues that the

---

[1] (...continued)
considered the matter deserving of a customs duty penalty. *Cf. Carnival Cruise Lines*, 404 F.3d 1312 (Fed. Cir. 2005) ($322,311 in underpayments of MPFs discovered as a result of a Customs audit for period April 1, 1987, and December 31, 1991; no indication that matter resulted in penalty).

circumstances before the Court are not extraordinary and do not justify mitigation. NSC continues to oppose imposition of any penalty, let alone the maximum penalty.

The Court concludes, after trial in San Francisco and after consideration of such factors as appeared relevant to the instant situation, that a lesser penalty for the harm inflicted of $10,000.00 of interest, calculated in accordance with subsection 1592(c)(4) from the original date of liquidation to the date of demand by Customs from NSC, is appropriate punishment for NSC's negligence. The Court reaches these conclusions for the following reasons.

The factors previously identified as relevant to a determination of the appropriate amount of penalty for a violation of section 1592(a) are the following: (1) the defendant's good faith effort to comply with the statute; (2) the degree of culpability involved; (3) the defendant's history of previous violations; (4) the nature of the public interest in ensuring compliance with the applicable law; (5) the nature and circumstances of the violation; (6) the gravity of the violation; (7) the defendant's ability to pay; (8) the appropriateness of the size of the penalty vis-a-vis the defendant's business and the effect of the penalty on the defendant's ability to continue doing business; (9) the economic benefit gained by the defendant through the violation; (10) whether the party sought to be protected by the statute is elsewhere adequately compensated for the harm; (11) the degree of harm to the public; (12) the value of vindicating agency authority; (13) whether the penalty shocks the conscience of the court; and (14) such other matters as justice may require. *See United States v. Complex Mach. Works Co.*, 23 CIT 942, 83 F. Supp. 2d 1307 (1999); *United States v. Modes, Inc.*, 17 CIT 627, 635, 826 F.Supp. 504, 512 (1993); *see also United States v. ITT Industries, Inc.*, 343 F. Supp. 2d 1322 (CIT 2004), *aff'd without opinion* No. 05-1210 2006 WL 380112 (Fed. Cir., Feb.

10, 2006) (concluding that it is appropriate to consider such factors in the context of a voluntary disclosure for a negligent violation of section 1592(a) and that in determining the amount of the penalty consideration of such factors is proper at trial and not on a motion for summary judgment). Since deterrence is the primary motivation for imposing a customs duty penalty, such factors are typically accorded greater weight, in proportion to their relevance, in determining the size of the penalty. *See*, *e.g.*, *Complex Machine*, 23 CIT at 950, 83 F. Supp. 2d at 1316.

In this matter, with regard to the first factor above, absent indicia of motive to preempt Customs' own discovery of a violation, a voluntary disclosure by definition speaks highly of a defendant's good faith effort to comply with the statute, as the government agrees. The government argues, however, that the interest-only penalty invoked under the voluntary disclosure statute takes this into account, and that the interest-only penalty is a form of "mitigation" in its own right. *E.g.*, P.'s Mem. in Supp. of Mot. for Summ J. at 14 (interest-only penalties are already a significant financial incentive and no further mitigation is unnecessary to encourage disclosure). That appears to be so, but such "mitigation" is to be distinguished from the Court's discretion on the appropriate amount of customs duty penalty to impose after consideration of all relevant circumstances.

Regarding the degree of culpability involved, NSC averred that its conduct amounted to ordinary negligence at worst. The government does not contest this characterization. Negligence amounts to the lowest degree of section 1592(c) culpability and is without *scienter*. That level of culpability having been agreed, further consideration of this factor is entwined with the nature and circumstances of the violations at issue, discussed below.

Regarding the third factor, NSC was the subject of one prior penalty action pursuant to 19 U.S.C. § 1592(a), which alleged gross negligence with respect to certain entries between June 1, 1979 and March 1, 1985, and resulted in Customs' acceptance of an offer in compromise pursuant to 19 U.S.C. § 1617 in the amount of $2,500,000 in full settlement of the matter in July 2001. *See* D.'s Mot for Summ J. at 11-12. Since 1999, NSC has made five prior voluntary disclosures. No determination or admission of culpability resulted from the one penalty action, and of the five prior disclosures, only two resulted in penalty demands, which are the subject of this action. The evidence suggests that the five disclosures by NSC all grew out of the same customs compliance review process. Constant review of one's customs compliance is to be encouraged, but at the same time the disclosures are indicative that serious lapses in proper customs reporting had been occurring over a considerable period of time. That is lamentable, not commendable, and if considered in isolation on balance this factor would not appear to support mitigation or at best would appear to support only nominal mitigation. But, it is the consideration of the factors as a whole, and not in isolation, that is dispositive.

Regarding the nature of the public interest in ensuring compliance with the applicable law, it is arguable whether this factor is to be viewed as supporting the imposition of a maximum penalty and without mitigation, since it would always appear to be in the public interest to ensure compliance with applicable customs law. But, such a viewpoint rather reflects the viewer's views on punishment. In this Court's view, to ensure compliance with applicable law, voluntary disclosure is to be encouraged, not discouraged. Therefore, insofar as voluntary disclosure is concerned, this factor would support finding mitigation, if circumstances permit.

Regarding the nature and circumstances of the violations at issue, NSC did not contest that they resulted from a lack of oversight during an unfortunate period of time.  In mitigation, NSC offered that it files between 3000 and 4000 entries with Customs per year, sometimes as many as 10,000, and that it has a long history of working proactively in the area of customs compliance.  Tr. at 89; Lawall Dep. at 36, 79.  NSC created an internal customs and export branch in the late 1970s or early 1980s with a mission to centralize and educate NSC employees about customs compliance, but in 1994 its customs director was diagnosed with cancer and was on protracted periods of medical leave of absence until passing in 1997.  *See* Lawall Dep. at 23, 84.  During much of this time, no one was apparently directing NSC's customs compliance program: the position had been occupied by the same person for "so long it was just kind of running on its own steam."  Tr. at 11 (quoting Lawall Dep. at 84).  *See also id*. at 98-99.

NSC's apparent loyalty to its employee(s) is admirable, but it does not excuse or completely explain the negligent reporting errors during the period(s) in question.  The first successor to direct NSC's customs compliance program was appointed in 1996.    *Cf*. Tr. at 13; D's Mot. for Summ J. at 4.  This person eventually, in 1997, contracted an outside consultant to undertake a through review of NSC's customs compliance efforts, but some reporting problems apparently continued to as late as September 30, 1998.  *Cf*. Compl. at ¶ ¶  4, 18; Ans. at ¶ ¶ 4, 18.  A more robust customs compliance program might have prevented the problems in the first place, before they occurred, or at least should have motivated speedier correction.  But, in the end, the Court is persuaded NSC's voluntary disclosures are evidence of "doing the right thing" and not of, or solely of, self-interest, *cf*., *e.g.*, Tr. at 78-79, 83-85, especially since the statute of limitations for bringing a customs penalty action was soon to begin to run with respect to the earliest reported entries, and it is questionable

whether Customs would have discovered the matters on its own before such time. On balance, the circumstances of NSC's voluntary disclosures support at least partial mitigation on this factor.

Regarding the degree of harm to the public, any violation of the customs laws results in public harm. One measure of harm is the magnitude of the underpaid fees, which in this instance, at over one million dollars, were not insubstantial. This factor does not support mitigation.

Regarding a defendant's ability to pay, NSC does not dispute its ability to pay an interest-only penalty, and this factor does not support mitigation.

Regarding the appropriateness of the penalty to the size of the defendant's business and the effect of the penalty on the defendant's ability to continue in business, in addition to Plaintiff's Exhibits 14-23, the Court takes judicial notice of NSC's quarterly report for the period ended February 26, 2006, as filed with the Securities and Exchange Commission on form 10-Q, and concludes that this factor does not support mitigation.

Regarding the economic benefit to NSC of the violations, which is the ninth factor, the Court finds that the underpayments were the equivalent of unauthorized interest-free loans to NSC. Consideration of this factor is therefore tied to consideration of the tenth factor.

The tenth factor is whether the party sought to be protected by the statute is elsewhere adequately compensated for the harm. In the Court's opinion, given the instant circumstances, this factor deserves the heaviest weighting. The government at several points raises the argument that even were the maximum penalty to be imposed, it would still fail to compensate the public treasury fully because the customs penalty statute imposes interest from the date of liquidation, leaving the (theoretical) interest on the period between the date of entry (or deposit of estimated duties) and the date of liquidation in the hands of NSC. *See, e.g.*, P.'s Mem. in Supp. of Mot. for Summ J. at 14-15

("[t]he statute does not provide the Government any interest recovery from the date of entry through liquidation[; t]herefore, importers in prior disclosure cases are essentially receiving an interest-free Government loan on money that should have been paid immediately upon entry") (referencing 19 U.S.C. §§ 1504(a), 1592(c)(4)).  Compensation is not the purpose of the customs penalty statute. *See United States v. DeBellas Enterprises, Inc.*, 23 CIT 600 (1999).  However, in view of the government's concerns, the Court finds that NSCs voluntary disclosures and payment of the fees alone do not provide a full measure of recompense for the amount of "lost" interest that resulted from NSC's underpayments.  The Court further finds that adequate compensation to the treasury for the interest on the underpayments is the primary objective of this penalty action.  The Court therefore finds, as a matter of fact, that compensatory interest would make the government whole, and that the government is entitled to it in accordance with 19 U.S.C. § 1505(c).  That provision requires interest to be assessed on underpayments or overpayments from the date of entry to the date of "liquidation or reliquidation."

As a general matter, liquidation is the final reckoning of the importer's liability on a specific entry, including regular and special duties.  It is defined by regulation as "the final computation or ascertainment of the duties or drawback accruing on an entry." 19 C.F.R. § 159.1.  The importer has 90 days to protest aspects of Customs liquidation findings.  Within that period, Customs may also voluntarily reliquidate the merchandise.  19 U.S.C. § 1501.  When the time for protesting a liquidation or voluntarily reliquidating has passed, liquidation is said to be final and conclusive as against all claims including those of the government.  *See* 19 U.S.C. § 1514(a) ("decisions of the Customs Service, including the legality of all orders and findings entering into the same" as to the appraised value of the merchandise "shall be final and conclusive upon all persons [ ]including the

United States" unless a protest is filed, etc.). This codification of finality in the statutory protest mechanism is not an absolute concept, however. One exception, by statute, is that reliquidation of an entry may occur within one year in order to correct "a clerical error, mistake of fact, or other inadvertence[.]" 19 U.S.C. § 1520(c)(1). Another is that section 1514 finality cannot attach to a liquidation in violation of a court-ordered injunction. *See Allegheny Bradford Corp. v. United States,* __ CIT __, 342 F.Supp.2d 1162 (CIT 2004); *AK Steel Corporation v. United States*, 281 F.Supp.2d 1318 (CIT 2003). And, before its repeal in 1993, section 521 of the Tariff Act of 1930 ("Act"), formerly 19 U.S.C. § 1521, provided for reliquidation of entry on Customs' initiative if fraud was discovered within two years of entry, which in turn was a protestable event. *See* Pub. L. 91-271, 84 Stat. 287 (June 2, 1970); s*ee also United States v. Jac Natori Co., Ltd.*, 17 CIT 348, 355, 821 F.Supp. 1514, 1520 (1993) (citations omitted).

The reason for this latter exception to the principle of finality should be obvious: import fraud does not involve a valid entry. That being the case, equitable limitations on fraud are involved, not the finality associated with the section 1514 protest mechanism. *See, e.g.*, *F. Vitelli & Son v. United States*, 250 U.S. 355, 39 S.Ct. 544 (1919) (liquidation in the absence of fraud becomes final); *United States v. Sherman & Sons Co.*, 237 U.S. 146, 35 S.Ct. 520 (1915) (same); *Bend v. Hoyt*, 38 U.S. 263, 268, 13 Pet. 263 (1839) (unverified and unauthenticated invoices "are declared to be deemed to be suspected, and liable to be treated in the same manner as fraudulent invoices"). Although Section 521 of the Act was repealed in 1993 by the North American Free Trade Agreement Implementation Act, Pub. L. 103-182 § 618, 107 Stat 2057, 2180 (Dec. 8, 1993), its equitable underpinnings still stand: a further disposition necessitated to correct, *e.g.*, fraud (or negligence) in the original entry amounts to a reliquidation of the entry as a matter of law. *Cf.* 19 U.S.C. §

1520(c)(1) (reliquidation permitted within one year in order to correct clerical error, mistake of fact, or other inadvertence and is protestable event); 19 C.F.R. 174.11(e) (matters subject to protest include "liquidation or reliquidation of an entry, or any modification thereof"). Taking the government's loan analogy a step further, Customs' acceptance of amounts tendered by NSC as repayment of the underpaid MPFs was akin to the repayment of principal on such loan. Such acceptance, based upon a determination of a violation of section 1592(a), therefore amounted to reliquidation of entries due to a change in the amount of MPFs claimed with respect thereto.

28 U.S.C. § 2643 authorizes this Court to enter monetary judgment for the United States in any civil penalty action commenced under 28 U.S.C. § 1582. Pursuant to that authority, the Court finds that the public treasury is entitled to compensation for the amount of "lost" interest on NSC's underpayments in accordance with 19 U.S.C. § 1505(c), which is not penalty interest, from the relevant dates of entry to the relevant dates of reliquidation, and further that such mechanism is adequate to provide full compensation to the government for same. The Court therefore finds that this tenth factor supports mitigation. *Cf. United States v. Menard*, 64 F.3d 678, 682 (Fed. Cir. 1995) (unable to distinguish lower court judgment as award of damages plus penalty). The only question is, when did "reliquidation" occur? On this, the government's loan analogy is apt, since the theoretical interest that the government argues is due from NSC would continue to accrue, in theory, over the many months that elapsed between issuance of the pre-penalty and penalty notices,[2] and yet

---

[2] For example, section 1505(c) compensatory interest, which is not penalty interest, apparently continues to accrue until paid, subject to section 1505(d) delinquency interest. But be that as it may, satisfaction of the judgment hereto shall be executed in accordance with Customs' usual demand for payment of interest on underpayments in accordance with 19 C.F.R. §§ 24.3, 24.3a, and any other relevant regulation implicated thereby.

Customs' pre-penalty and penalty notices demanded identical amounts of interest. *Cf.* Compl. at ¶¶ 9, 10 *with* Ans. at ¶¶ 9, 10 (no change in interest demanded). Customs therefore implicitly reliquidated upon issuance of the pre-penalty notice.

The remaining factors to be considered in this matter tend, on the whole, to support mitigation. As a general principle, any violation of 19 U.S.C. § 1592(a), however minor, may result in a penalty finding. *Cf.* 19 U.S.C. § 1592(b)(2) ("[i]f the Customs Service determines that there was a violation, it *shall* issue a written penalty notice to" the alleged violator) (italics added). In this instance, the circumstances of the passing of NSC's customs director, the transition to a new customs director, and the process of conducting a thorough review of its customs compliance program do not excuse the negligent entry errors that occurred in the first place during the period(s) in question. Nonetheless, remediation or attempted remediation of misfeasance or nonfeasance may support a finding of full or partial mitigation of the penalty. *See, e.g.*, P.'s Ex. 12 at 7 (*The ABC's of Prior Disclosure* at 1 (USCBP, ed., rev. May 2001)) ("[i]n some cases the penalty may be reduced to zero"); P.'s Ex. 13, Ch. FRD, at 12-13 (*Fines, Penalties and Forfeitures Handbook*, HB 4400-01, Ch. FRD at 5-6 (USCBP, ed., 1986)) (listing mitigating factors to consider including the violator's degree of cooperation, immediate remedial action, inexperience in importing, prior good record, and other extraordinary factors); D.'s Ex. A (19 C.F.R., App. B to Part 171, *Customs Regulations, Guidelines for the Imposition and Mitigation of Penalties for Violations of 19 C.F.R. 1592*) (Electronic Code of Federal Regulations, as of Dec. 28, 2005). Voluntary disclosure is a significant step towards remedying the degree of harm to the public. By its actions, in addition to making full payment of fees owed, NSC has saved Customs the expense and time of investigation, an important consideration. Further worth considering is that valuation for purposes of assessing customs duties

and fees is not necessarily a straightforward matter,[3] that reasonable minds may differ over proper cost accounting methodology, and that appropriate transfer pricing, which appears to have been largely the reason for the problem pertaining to the underpayments at issue, is not an exact science, as evident in the apparently endless process of developing and updating internal manuals to address, *inter alia*, customs compliance, corporate policies thereon, and instruction therefor. *See*, *e.g.*, Tr. at 78-85, 90-92; D.'s Ex. D (NSC's internal *U.S. Customs & Border Patrol* [*sic*] *(CBP) Customs Compliance Manual* (rev. Jan. 23, 2004)). In light of NSC's ongoing customs compliance efforts and the circumstances of the voluntary disclosures at bar, the Court is unpersuaded that a "maximum" civil penalty, in addition to payment of interest compensating the government, would not further the policy of deterrence behind the imposition of customs penalties. NSC appears to have already made thorough customs compliance one of its top priorities, regardless of the outcome of this matter. Thus, after considering all relevant factors, the Court finds, under the circumstances, that partial mitigation is appropriate, and that the agency's authority will be vindicated by an "interest-only" penalty amounting to $10,000.00, as calculated in accordance with subsection 1592(c)(4) from the original date of liquidation to the date of demand by Customs issued to NSC. Such a penalty can hardly be said to shock the Court's conscience and is appropriate to address NSC's misfeasance.

Lastly, the Court is unaware of "such other matters as justice may require," except to note that pre- and post-judgment interest, if any, shall accrue as provided by law.

---

[3] *See*, *e.g.*, *Carnival Cruise Lines*, *supra*, 404 F.3d at 1313, in which "[t]he two issues that formed the basis for the asserted underpayment were (1) Carnival's failure to make HMT payments based on passengers' boarding or disembarking during layover stops in the course of cruises, and (2) Carnival's deduction of travel agents' commissions from the price of the cruise tickets that Carnival used to calculate the amount of HMT that was due."

Judgment will enter accordingly.


_____/s/  R. Kenton Musgrave_____
R. KENTON MUSGRAVE, JUDGE


Dated: June 16, 2006
         New York, New York

## ERRATA

Please make the following changes to *United States v. National Semiconductor Corp.*, Court No. 03-00223, Slip Op. 06-90 (Ct. Int.'l Trade June 16, 2006):

- Page 2, line 1: replace "asserts" with "assists".

- Page 7, line 15: replace "through" with "thorough".

- Page 10, line 17: replace "unathenticated" with "unauthenticated".

- Page 13, line 10: delete "not".

June 21, 2006.